*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

POLICE OFFICERS ASSOCIATION OF
MICHIGAN,

UNPUBLISHED
January 10, 2025
11:25 AM

Respondent-Appellant,

v

No. 368160
MERC
LC No. 18-000005

TODD E. HATFIELD,

Charging Party-Appellee.

Before: N. P. HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

This is the second time this case has been before this Court. Charging party initiated unfair-labor-practices charges against his former employer, City of Grayling, and respondent-appellant, Police Officers Association of Michigan (POAM).[1] On remand from this Court to apportion damages, see *Police Officers Ass'n of Mich v Hatfield*, unpublished per curiam opinion of the Court of Appeals, issued July 22, 2021 (Docket No. 354627), the Administrative Law Judge (ALJ) issued an opinion and recommended order finding that respondent should not be apportioned any damages. The Michigan Employment Relations Commission (MERC) issued an opinion and order rejecting the ALJ's finding. MERC determined that respondent should make charging party whole by compensating him for any loss of pay and other economic or fringe benefits that he suffered from October 1, 2018, until the entry of a final order in this matter, with interest computed at the statutory rate, less any interim earnings. Respondent appeals by right. We affirm.

---

[1] Charging party's former union, Fraternal Order of Police Labor Council (FOPLC), was also named in the petition, but charging party later withdrew these charges.

## I. BACKGROUND

### A. FIRST APPEAL

This Court set forth the pertinent factual background of this case when it issued its decision in the prior appeal:

Charging party was hired as an on-call firefighter by the City of Grayling in 1997, and in 2013 was hired full-time as the Assistant Fire Chief of the Grayling Department of Public Safety. Charging party completed his police academy training and was certified by the Michigan Commission on Law Enforcement Standards (MCOLES) on May 21, 2014, although he continued to work primarily as a firefighter and filled in for police duties as needed. Charging party was part of a bargaining unit under the Fraternal Order of Police Labor Council (FOPLC), which had a collective-bargaining agreement with the City effective from July 1, 2014 to June 30, 2017 ["the FOPLC CBA"]. In May 2017, before the collective-bargaining agreement expired, the union members voted for respondent to become their new union. In June 2017, the union members voted to remove command positions from the bargaining unit, which affected charging party's position as Assistant Fire Chief. On August 2, 2017, the City signed a tentative agreement with respondent, which excluded the Assistant Fire Chief position from the union.[2] Charging party discussed forming a command union, but on October 10, 2017, charging party was informed that because of department restructuring, his position as Assistant Fire Chief had been eliminated. Charging party verbally accepted a position as a patrol officer and began on October 16, 2017.

On November 6, 2017, [Doug] Baum informed charging party that because of his new position, charging party was now the lowest in seniority. Charging party disagreed with the decision, and argued that under the FOPLC collective-bargaining agreement, seniority was based on when an officer's MCOLES status was activated, and charging party had an earlier certification than two of the other full-time police officers. Charging party testified that he verbally requested that respondent's business agent, Paul Postal, file a grievance on his behalf, and even provided Postal the section of the FOPLC contract that he believed was breached. Charging party testified that Postal told him that he "couldn't do anything" because respondent did not have a signed collective bargaining agreement with the City.

On November 28, 2017, the Deputy Police Chief gave charging party a letter of employment for the patrol officer position, which stated that charging party would serve a 12-month probationary period from the position start date of October

---

[2] The City and respondent ultimately executed a new CBA on January 23, 2018 ("the 2018 CBA"), and the two agreed that it would apply retroactively to July 1, 2017.

16, 2017. Charging party again contacted Postal and explained that he did not feel comfortable signing the employment letter. Postal suggested that he sign the letter, come to work, and "fly under the radar" for the remaining 11 months of the probationary period.

On November 16, 2017, a Department of Natural Resources (DNR) Conservation Officer contacted charging party regarding an illegal bait pile on his property. The officer explained that he had given a citation to charging party's brother the day before. Charging party told the officer that if he got a citation, he would lose his job. The conservation officer allowed charging party to clean up the bait pile and did not issue him a citation. Charging party testified that he did not feel a need to report the incident to his employer.

On December 6, 2017, Baum interviewed charging party about the incident. Charging party initially denied having any encounter with law enforcement because he thought that Baum meant police contact, but eventually explained his interaction with the DNR. Baum testified that charging party did not disclose the truth until he was prompted with specific questions. Charging party testified that during the meeting, Baum also told him to sign the November 28 employment contract or be out of a job, so charging party signed it.

On December 14, 2017, Baum offered charging party a choice between resignation and termination because of charging party's dishonesty and insubordination during the December 6 interview. Charging party again contacted Postal, who unsuccessfully attempted to negotiate with Baum. Charging party chose to accept the termination so he could file a grievance. Charging party testified that he e-mailed Postal the next day and requested that he file a grievance, but was told that it was an FOPLC issue, so Postal could not help. Charging party e-mailed another POAM business agent requesting to file a grievance, and the business agent advised him to hire an attorney.

On March 16, 2018, charging party filed charges of unfair labor practices against the City and respondent under the Public Employment Relations Act (PERA), MCL 423.201 *et seq*., asserting, relevant to this appeal, that respondent breached its duty of fair representation by failing to grieve his demotion and termination. On August 29, 2019, an ALJ issued a decision and recommended order finding that charging party's charges against the City were unsupported because charging party had not established that any of the [City's] actions were prompted by anti-union animus. With respect to respondent, the ALJ found that charging party had not shown respondent's actions were unreasonable, arbitrary, or unlawful. The ALJ reasoned that because the FOPLC contract had expired and a tentative agreement between the City and respondent was signed in August 2017, the decision to reduce charging party's seniority and place him on probation was supported. The ALJ concluded that the evidence did not establish that charging party had requested to file a grievance regarding his termination, and that the failure to file a grievance alone did not establish unfair labor practices.

-3-

Charging party filed exceptions to the ALJ's decision and on August 11, 2020, MERC issued an order affirming in part and reversing in part the ALJ's decision. MERC agreed that charging party's charge against the City was unsupported and should be dismissed because charging party had not demonstrated that the City acted with anti-union animus, but MERC determined that respondent breached its duty of fair representation by failing to file a grievance regarding charging party's loss of seniority or his termination. MERC concluded that charging party should not have lost his seniority or been placed on probation because the tentative agreement was not legally enforceable and the City was still bound by the FOPLC collective-bargaining agreement. MERC concluded that charging party would *likely be able to show* that the City did not terminate him for cause and that charging party clearly communicated his desire to file a grievance. Therefore, MERC reversed the ALJ's decision and remanded the case to the ALJ for issuance of a cease and desist order. Regarding damages, MERC remanded the case to the ALJ to issue an order recommending that the City and respondent arbitrate the merits of charging party's termination, and should the City fail to consent to arbitration, respondent would be required to pay charging party's damages (back-pay minus mitigation). A MERC Commission Chair filed a dissenting opinion, opining that the damages were an improper remedy under *Iron Workers Local Union 377, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, *AFL-CIO (Alamillo Steel)*, 326 NLRB 375 (1998). MERC disagreed and concluded that *Alamillo Steel* conflicted with other precedent and should be overturned. [*Police Officers Ass'n of Mich*, unpub op at pp 2-4 (emphasis added).]

On appeal, respondent argued that MERC erroneously concluded that respondent had breached its duty of fair representation when it did not pursue the requested grievance on behalf of charging party, but this Court disagreed. *Id*. at 4. This Court held that charging party was a member of respondent and included under the FOPLC CBA, which meant respondent owed him a duty of fair representation. *Id*. at 4-5.

Respondent argued that charging party had failed to show that the City violated any of the CBAs, but this Court disagreed, reasoning that

Article 5, § 1 of the FOPLC collective-bargaining agreement stated that a non-probationary employee could not be terminated except for just cause. MERC concluded that the record established that charging party was not discharged for just cause under the collective-bargaining agreement, and MERC's findings of fact "are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole." [*Id*.]

This Court concluded that the record supported MERC's determination "because charging party testified that he responded to all questions at the December 6 interview truthfully, he disclosed the DNR contact at the interview, he had no discipline on his record prior to his discharge, and Baum referred to him as an excellent employee." *Id*. Accordingly, this Court held that MERC did not err by concluding that the City breached the FOPLC CBA when it terminated charging party without just cause. *Id*. at 7. Additionally, this Court held that respondent breached its duty of fair representation in multiple ways. See *id*. at 5-6. Pertinent to this appeal, this Court determined that

respondent breached its duty of fair representation by failing to file a grievance regarding charging party's termination. *Id*. at 6.

Regarding damages, respondent argued that MERC erroneously ordered respondent to potentially pay full back pay as a remedy. *Id*. at 7. This Court "agree[d] that MERC erred by concluding that *Alamillo Steel* conflicted with precedent and agree[d] that MERC's award of full back-pay damages was unsupported by law." *Id*. Furthermore, this Court stated that, "[a]lthough we find that respondent did breach its duty to fairly represent charging party and find that charging party was improperly terminated without just cause, respondent should only be responsible for its own portion of damages." *Id*. at 9. Given that MERC had already determined "that charging party's grievance had merit, the only remaining issue is for the ALJ to determine what portion of damages respondent owed charging party." *Id*.

## B. PROCEEDINGS ON REMAND

On remand, MERC entered an order referring the case back to the ALJ for an expedited evidentiary hearing to determine what portion of damages resulted from respondent's breach. After the evidentiary hearing, the ALJ entered a decision and recommended order concluding that, although respondent had breached its duty of fair representation, charging party had failed to show any damages stemming from this breach. The ALJ determined that respondent could and should have arbitrated charging party's grievance under the 2018 CBA because it was retroactively applied to the expired period and because there was no language suggesting that grievances and arbitration were excluded. This meant that charging party's grievances were arbitrable. However, the ALJ further determined that charging party had failed to show damages attributable to respondent. According to the ALJ, the claimed damages stemmed entirely from the City's decision to wrongfully terminate charging party. Therefore, the ALJ recommended that no damages be apportioned to respondent.

Both parties filed exceptions to the ALJ's decision. Respondent argued that the ALJ had erred by determining that, if respondent had pursued charging party's grievance, the grievance would have been arbitrable. According to respondent, such a grievance was only "arguably arbitrable." Charging party argued that the ALJ had erred by recommending no damages. MERC entered an order affirming in part and reversing in part the ALJ's decision. MERC determined that the ALJ had erred by analyzing whether charging party's grievances were arbitrable, reasoning that the merits of charging party's grievances had already been determined by this Court to be arbitrable prior to remand, which implicated the law-of-the-case doctrine. MERC also disagreed with the ALJ's conclusion that respondent was not liable for damages. MERC reasoned that although the City had wrongfully terminated charging party, it was respondent's breach of its duty of fair representation that had prevented the grievance process, thereby increasing charging party's damages.

As for the amount of damages, MERC followed precedent that allowed for damages to be apportioned to a union based on the damages that accrued after an approximate date on which a favorable arbitration decision would have been rendered. Relying on testimony from the hearing on remand, MERC determined that such an award would have occurred by October 1, 2018. Accordingly, MERC determined that respondent was liable for monetary damages less any interim earnings from that date onward until a final decision was rendered in this case. As for respondent's

exception, MERC concluded that respondent's argument was not only untimely raised but also without merit. MERC reasoned that respondent had failed to raise this argument in any of the proceedings prior to remand. Regardless, MERC determined that even if the argument was timely raised, the result would not have changed because charging party's grievances were arbitrable under the FOPLC CBA. MERC also referenced this Court's prior decision in which it rejected respondent's argument.

This appeal followed.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

"The scope of judicial review of a decision from MERC concerning alleged unfair labor practices varies depending on whether the alleged error is one of fact or law." *Technical, Prof, & Officeworkers Ass'n of Mich v Renner*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 162601); slip op at 13. Pursuant to Const 1963, art 6, § 28, appellate courts must "determine whether the final [administrative] decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record." *Id*. (quotation marks omitted; alteration in original). Pursuant to MCL 423.216(e), "MERC's findings of fact, if supported by competent, material, and substantial evidence on the record considered as a whole, shall be conclusive." *Id*. (quotation marks and alteration omitted).

Additionally, "MERC has the administrative expertise to entertain and reconcile competing allegations of unfair labor practices and misconduct under the PERA," and an appellate court "gives respectful consideration to the construction of a statute by an agency charged with implementation and enforcement of the statute such that an agency's interpretation will not be overruled absent cogent reasons for doing so . . . ." *Id*. at ___; slip op at 13-14 (quotation marks and citations omitted). However, "the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id*. (quotation marks and citation omitted). Therefore, appellate courts will review de novo MERC's legal rulings and will set such rulings "aside if they violate a constitutional or statutory provision or they are based on a substantial and material error of law." *Id*. at ___; slip op at 14 (quotation marks and citation omitted). Finally, this Court reviews de novo questions of law, such as issues involving the law of the case. *Rott v Rott*, 508 Mich 274, 286; 972 NW2d 789 (2021).

### B. DAMAGES

Respondent argues that MERC erred by apportioning any damages to it. According to respondent, charging party failed to demonstrate how any of his damages stemmed from respondent's failure to pursue a grievance on his behalf. We disagree.

Congress created the National Labor Relations Act (NLRA) to "establish[] a policy of national uniformity in labor relations." *Bebensee v Ross Pierce Electric Corp*, 400 Mich 233, 240; 253 NW2d 633 (1977). PERA was modeled after the NLRA, so "it may be presumed that the Legislature intended the courts, in construing PERA, to rely on federal precedent developed under

the NLRA." *Harris v Amalgamated Transit Union*, 122 Mich App 706, 709-710; 333 NW2d 1 (1982). For cases involving PERA, Michigan courts have looked to *Vaca v Sipes*, 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 (1967). See, e.g., *Demings v Ecorse*, 423 Mich 49, 57-64; 377 NW2d 275 (1985). Indeed, this Court previously described *Vaca* as "[t]he leading case on how damages should be assessed against a union which breaches its duty of fair representation." *Harris v Amalgamated Transit Union*, 122 Mich App 706, 709-710; 333 NW2d 1 (1982) (citation omitted).[3] Michigan courts have looked to decisions from the National Labor Relations Board (NLRB) for guidance. See, e.g., *Kent Co Deputy Sheriff's Ass'n v Kent Co Sheriff*, 463 Mich 353, 357-359; 616 NW2d 677 (2000). "The appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach." *Vaca*, 386 US at 195. "The governing principle . . . is to apportion liability between the employer and the union according to the damage caused by the fault of each." *Id*. at 197. Damages that are "attributable *solely* to the employer's breach of contract should not be charged to the union, but *increases* if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer." *Id*. at 197-198 (emphasis added).

In *Bowen v United States Postal Serv*, 459 US 212, 223; 103 S Ct 588; 74 L Ed 2d 402 (1983), the Court held that, although it was the employer who wrongfully terminated the employee, "[t]he union's breach of its duty of fair representation . . . caused the grievance procedure to malfunction resulting in an increase in the employee's damages." Therefore, the Court held that although both the employer and union caused damages to the employee, "the union is responsible for the increase in damages and, as between the two wrongdoers, should bear its portion of the damages." *Id*. On appeal, the union argued that the employer should be solely liable for damages and that the union could only be liable "for Bowen's litigation expenses resulting from its breach of duty." *Id*. at 218-219. The union relied on "*Vaca*'s recognition that a union's breach of its duty of fair representation does not absolve an employer of all the consequences of a breach of the collective-bargaining contract." *Id*. at 219. The Court, however, rejected this interpretation of *Vaca*, reasoning that it "fails to recognize that a collective-bargaining agreement is much more than traditional common law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy." *Id*. at 219. The Court explained that, although the employer wrongfully terminated Bowen and was liable for this, "[t]he union's breach of its duty of fair representation . . . caused the grievance procedure to malfunction resulting in an increase in the employee's damages." *Id*. at 223. Therefore, the Court held that although both the employer and union caused damages to Bowen, "the union is responsible for the *increase in damages* and, as between the two wrongdoers, should bear its portion of the damages." *Id*. (emphasis added).

In the present case, this Court already affirmed MERC's prior determination that charging party was terminated without just cause. See *Police Officers Ass'n of Mich*, unpub op at 5-6. Accordingly, MERC correctly determined that the ALJ did not need to analyze whether charging

---

[3] While this Court is "not *strictly required* to follow uncontradicted opinions from this Court decided before November 1, 1990," these opinions are "considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

party's grievance would have been successful on the merits because this had already been decided by this Court on appeal and prior to MERC's remand order. Moving to the apportionment of damages, we discern no error in MERC's reasoning. Respondent's breach of its duty of fair representation prevented charging party from filing a grievance, having that grievance proceed to arbitration, and being reinstated by the arbitrator. If respondent had properly represented charging party, charging party's damages would have been "tolled" when the arbitrator reinstated charging party. Although true that damages attributable solely to the employer should not be apportioned to a union, a union's actions can *increase* damages arising from unlawful termination. See *Vaca*, 386 US at 197-198; *Bowen*, 459 US at 223. Therefore, it was incorrect for the ALJ to focus solely on the fact that charging party's damages stemmed from his termination by the City because respondent's actions increased such damages.

The fact that charging party sought economic damages was also not dispositive because nothing in *Vaca*, *Bowen*, or their progeny suggest that the type of damages being sought has any bearing on the matter. Furthermore, MERC's calculation of the damages was not erroneous. In *Bowen*, the Court left undisturbed the district court's instruction to the jury that it could apportion damages by determining a hypothetical date that employment would have been reinstated had the union acted properly. See *Bowen*, 459 US at 214-215. Other federal courts have either used that method or have determined that the method is at least a permissible way of calculating damages. See, e.g., *Aguinaga v United Food & Commercial Workers Int'l Union*, 993 F2d 1463, 1476-1477 (CA 10, 1993) (explaining that the "hypothetical arbitration date method" is a proper method of damage calculation). Contrary to respondent's contentions, MERC did not apportion *all* possible damages to respondent. Rather, by utilizing a hypothetical date on which an arbitrator could have rendered a decision in charging party's favor, MERC only apportioned those damages that were increased as a result of respondent's actions, along with any interim earnings subtracted.

We also discern no error in the date MERC used for the hypothetical arbitration award. Charging party was given the choice to resign or face termination on December 14, 2017. Testimony at the hearing on remand showed that it would take 30 to 35 additional days for an arbitrator to be appointed, five to six additional months to be heard at arbitration, 30 to 45 additional days for briefs, and another 30 to 45 days for the arbitrator to render a decision. Although there was testimony that it *could* take as many as 90 days for the arbitration process to begin, MERC determined that the language of the CBA required a minimum of only 10 days, and respondent has not disputed this. Taking these numbers into account, October 1, 2018, approximately 10 months after the termination, was amply within the possible time for arbitration.

## C. WAIVER

Respondent argues that MERC erred by determining that it had waived its argument regarding the arbitrability of charging party's grievance. While we agree that respondent raised this issue early in this case, we discern no error in MERC's conclusion that even if was timely raised the result would not have changed.

"In civil cases, Michigan follows the raise or waive rule of appellate review." *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 2. "If a litigant does not raise an issue in the trial court, this Court has no obligation to consider the issue." *Id*. at ___; slip op at 3. In a post-hearing brief from 2019,

respondent stated that there was "uncertainty at the very least when it comes to the enforcement of the expired CBA and in particular grievance arbitration rights." Accordingly, respondent did raise this argument early on in these proceedings. However, the end result is the same.

MERC determined that, even if timely and not waived, the result would not be different because charging party's grievances were arbitrable under the FOPLC CBA. MERC referenced this Court's prior decision as the law of the case. Indeed, this Court held that the City was required to enforce the FOPLC CBA even after it expired and after the City entered into a "tentative agreement" with respondent because such an agreement was "not a legally enforceable collective-bargaining agreement under PERA." *Police Officers Ass'n of Mich*, unpub op at 5. This is the law of the case, see *Rott*, 508 Mich at 286-287, and MERC did not err by following it.

MERC also determined that it had previously held that, when "an election on a representation petition is conducted and the results certified, the existing contract continues in effect even if the incumbent union is defeated." MERC concluded that the FOPLC CBA remained in effect until the 2018 CBA was executed. Indeed, the NLRB has expressly stated that

> after a labor contract expires, an employer has a duty to maintain the status quo. Although the status quo is ascertained by looking to the substantive terms of the expired contract, the *obligation* to maintain the status quo arises out of the Act, not the parties' contract. After a contract expires, "terms and conditions continue in effect by operation of the NLRA. They are no longer agreed-upon terms; they are terms imposed by law." [*Nexstar Broadcasting, Inc*, 369 NLRB No 61 (2020) (citations omitted).]

In the prior appeal, this Court cited *Nexstar* with approval. See *Police Officers Ass'n of Mich*, unpub op at 5 n 3. See also *Ottawa Co v Jaklinski*, 423 Mich 1, 21-22; 377 NW2d 668 (1985) (stating "that the right to grievance arbitration survives the expiration of the collective bargaining agreement when the dispute concerns the kinds of rights which could accrue or vest during the term of the contract").

Respondent cites *Southeastern Mich Transp Auth v Amalgamated Transit Union*, 116 Mich App 154, 157; 321 NW2d 876 (1982), in which this Court quoted from United States Supreme Court precedent: "For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (Quotation marks and citation omitted). However, that case dealt with issue whether probationary employees could submit grievances, and the CBA explicitly provided that they could not. See *id*. at 157-158. Here, respondent points to no provision of any of the CBAs expressly prohibiting charging party from bringing any of his grievances, thereby making *Southeastern* distinguishable. Similarly, in *AFSCME Council 25 v Wayne Co*, 290 Mich App 348, 350-351; 810 NW2d 53 (2010), there was language in the CBA expressly providing: "In the event differences should arise between the Employer and the Union *during the term of this Agreement* as to the interpretation and application of any of its provisions, the parties shall act in good faith to promptly resolve such differences in accordance with the following procedures . . . ." (Quotation marks omitted.) Here, once again, respondent points to nothing in the CBAs that limited arbitration to the duration of the FOPLC CBA.

The City and respondent executed a new CBA on January 23, 2018, and the two agreed that it would apply retroactively to July 1, 2017. This distinguishes the present case from situations in which no such retroactivity agreement exists for the successor CBA. See *Gibraltar Sch Dist v Gibraltar MESPA-Transp*, 443 Mich 326, 336 n 7; 505 NW2d 214 (1993) (recognizing that "parties might negotiate that any successor agreement might be retroactive to the date of the expiration of the prior agreement, with the intent that pending, unresolved grievances might be submitted to arbitration under the successor agreement"). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Southeastern Mich Transp*, 116 Mich App at 157 (quotation marks and citation omitted), but, here, the City and respondent expressly agreed to subject themselves to arbitration by retroactively applying the 2018 CBA.

## D. LAW OF THE CASE

Finally, respondent argues that MERC erred by applying the law-of-the-case doctrine regarding whether charging party was terminated without just cause. We disagree.

Respondent argues that this Court mischaracterized MERC's prior conclusion because MERC never actually found that charging party was terminated without just cause and that this Court then erred by "affirming" this mischaracterization. On remand the ALJ stated that, although this Court "affirmed a factual finding not made by" MERC, it was bound by this decision pursuant to the law-of-the-case doctrine. When reversing the ALJ, MERC referred to this Court's prior opinion as an "independent finding" that charging party was terminated without just cause and concluded that it was bound by that determination. Respondent argues that the law-of-the-case doctrine should not apply under these circumstances.

The law-of-the-case doctrine was "judicially created" in order "to promote consistency throughout the life of a lawsuit." *Rott*, 508 Mich at 286. As explained by our Supreme Court, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *Id*. (quotation marks and citations omitted). Accordingly, "an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals." *Id*. (quotation marks and citation omitted). This doctrine is applicable only when issues are "*actually decided*, either implicitly or explicitly, in the prior appeal." *Id*. at 287 (quotation marks and citations omitted).

In *Rott*, 508 Mich at 287-288, our Supreme Court carved out a narrow exception to this doctrine, holding that it should not be applied "to preclude appellate review of a contested question of law that was presumed but not decided against a party in an interlocutory appeal if doing so would deprive the party of their right to appeal an unfavorable trial court decision on that issue." *Id*. at 288. Prior to the appeal to our Supreme Court, this Court had "held that plaintiff's arguments concerning the applicability of the [recreational land use act (RUA)] had already been decided against her as a part of defendant's interlocutory appeal and that those arguments were, therefore, barred by the law-of-the-case doctrine." *Id*. at 281. Our Supreme Court reversed, determining that the applicability of the RUA was never raised in the interlocutory appeal and never properly before this Court, thereby precluding application of the doctrine. See *id*. at 288-291. It was within

this context and narrow holding that the Supreme Court stated that the "doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, *not a limit to their power*," and that "the doctrine does not apply if the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice." *Id*. at 287-288 (quotation marks and citations omitted). Therefore, *Rott* does not support respondent's argument that courts may freely depart from the law-of-the-case doctrine if their prior decision was clearly erroneous and would result in manifest injustice.

Further, even assuming arguendo that the prior panel misstated MERC's decision, the fact that respondent failed to follow any of the procedures in place to rectify mistakes made by this Court precludes a conclusion that the application of this doctrine would work a manifest injustice. If respondent believed that this Court misunderstood or misstated MERC's decision, then it should have moved for reconsideration within 21 days pursuant to MCR 7.215(I). Respondent also could have applied for leave to appeal in the Supreme Court pursuant to MCR 7.305. Instead, respondent allowed this Court's opinion to become final and resumed the administrative proceedings. Only now, during the second appeal in this matter, does respondent attempt to rectify what it perceives as errors in the prior opinion. Simply put, that ship has sailed.

Affirmed. Charging party, having prevailed, may tax costs. See MCR 7.219(A).

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado

-11-